**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY



_____

                  :

In re:              :

                :    CHAPTER 7

SCOTT P. COWAN,      :

      Debtor.      :

                :    CASE NO.:   16-14758 (SLM)

                :

_____ :

                :

ANDREW R. VARA,      :
Acting United States Trustee, :    ADV. NO.:   17-01247 (SLM)

      Plaintiff,    :

v.              :

                :

SCOTT P. COWAN,      :

      Defendant.   :

_____ :

**Order Filed on October 23, 2019
by Clerk, U.S. Bankruptcy
Court - District of New Jersey**

**OPINION ON SUMMARY JUDGMENT**

<u>**APPEARANCES :**</u>

David Gerardi, Esq.
Department of Justice, Office of the United States Trustee
One Newark Center, Suite 2100
Newark, NJ 07102

David L. Stevens, Esq.
Scura, Wigfield, Heyer, Stevens & Cammarota, LLP
1599 Hamburg Turnpike
Wayne, NJ 07470

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

In this adversary proceeding, the United States Trustee ("**UST**" or "**Plaintiff**") challenges debtor Scott P. Cowan's ("**Debtor**" or "**Defendant**"), ability to obtain a discharge in his Chapter 7 bankruptcy case.  The UST seeks denial of Debtor's discharge pursuant to § 727(a)(3) of Title 11 of the United States Code ("**Bankruptcy Code**") on the basis that Debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained" and Debtor's failure to provide adequate records was not justified.[1]

Before the Court is *Defendant's Motion for an Order Granting Summary Judgment* ("**Motion**")[2] filed by Debtor, by and through his counsel, Scura, Wigfield, Heyer, Stevens & Cammarota, LLP.  Debtor argues he is entitled to summary judgment because he has not concealed, destroyed, mutilated, falsified, or failed to keep records from which his financial condition could be ascertained.[3]  The UST filed *Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment* ("**Cross-Motion**").[4]  The UST asserts this Court should not grant Debtor summary judgment because Debtor failed to file corporate tax returns for his closely-held, home-building business for the 2015 fiscal year, which demonstrates Debtor concealed or

2

failed to keep adequate records as required under 11 U.S.C. § 727.[5]  The UST also asserts Debtor

failed to demonstrate he was justified in providing inadequate records.  The UST, therefore, asserts

Debtor is barred from discharge under 11 U.S.C. § 727(a)(3).[6]

The Court reviewed the pleadings submitted and held oral argument. The following

constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of

Bankruptcy Procedure 7052.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a)

and the Standing Order of Reference from the United States District Court for the District of New

Jersey dated July 23, 1984 and amended September 18, 2012.  This matter constitutes a core

proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (J), as it involves the administration of the

estate and objection to discharge, respectively.  Venue is proper under 28 U.S.C. § 1409.

## FACTUAL BACKGROUND—UNDISPUTED FACTS

On February 6, 2013, Debtor along with others formed Price Home Group, LLC ("**Home

Group**") under the laws of the state of New Jersey.[7]  Home Group engaged in general construction

and registered with the State of New Jersey as a general home contractor.[8]  Home Group worked

with the State of New Jersey's Rehabilitation, Reconstruction, Elevation and Mitigation Program

(the "**State Rehabilitation Program**"), the organization responsible for hirinig construction

companies to rebuild homes in the aftermath of Hurricane Sandy.[9]

Debtor became proficient with requirements of the State Rehabilitation Program in order

to receive projects and state funding, which included reporting to three state program managers

and to the Department of Consumer Affairs.  It also involved: (1) learning how to comply with

Housing and Urban Development Section 3 regulations; and (2) obtain Environmental Protection

Agency lead, asbestos, and remediation certification. Debtor also attended meetings and seminars to learn about building requirements.[10]

Home Group encountered a number of logistical and financial difficulties.[11] Home Group's relationship with the State Rehabilitation Program became problematic when Home Group was unable to meet what Defendant characterized as "unrealistic deadlines" established by the State Rehabilitation Program.[12] Home Group failed to meet certain deadlines and as a result, the State Rehabilitation Program and flood insurance companies refused to pay any funds to Home Group until it completed each reconstruction and repair project. This left Home Group unpaid for the duration of the work.[13]

**Home Group's Financial Records**

Home Group's financial statements were compiled in QuickBooks™ by Joyce Burgess Bartlett of Bartlett CPA, both Home Group's and Debtor's accountant. Ms. Bartlett calculated Home Group's profits based on the percentage of completion of Home Group's current contracts as required by its insurance bonding company. Ms. Bartlett's calculations assumed 25% profits per project. However, that number was incorrect.[14] In reality, gross profits only averaged 2% in both 2013 and 2014, with an increase to 13% in 2015.[15] Additionally, Home Group's 2014 federal income tax return disclosed Home Group operated at a loss of $1,068, 515.[16] Debtor and his co-member received $642,260 in distributions from Home Group in 2014, as per Home Group's 2014 tax return, Schedule K.[17]

**The 2015 Tax Returns**

In 2015, Debtor received an average of $20,000 a month in distributions from Home Group. Debtor also received a bi-weekly salary, which amounted to approximately $32,000 annually.[18] Debtor filed his personal 2015 return, which reflected a negative $411,371 net operating loss on a

line item denoted as "Other Income".[19]  Debtor testified the negative $411,371 net operating loss

signified the distribution he received from Home Group.[20]  Notably, Home Group failed to file its

2015 tax return.

**Debtor's Other Business Experience**

Over the years, Debtor also had had ownership interests in other businesses.[21]  From 2007

to 2010, Debtor operated Shenoa, an online jewelry store.  Debtor, as Chief Operating Officer,

oversaw 80 employees.[22]  From 2010 to 2013, Debtor owned New Jersey State Gold Buyer, a

jewelry pawn shop.[23]  As of the petition date, Debtor was the sole proprietor of Cowan Consulting,

LLC, which he operated in conjunction with Home Group, and had had an ownership interest in

Palisades Regional Investment Fund II, LLC.[24]

**Debtor Files Bankruptcy**

In November 2015, Home Group began winding down operations.[25]  Approximately four

months later, on March 15, 2016, Debtor filed a voluntary Chapter 11 petition, Case No. 16-14758

(the "**Main Case**").[26]  On March 30, 2016, Debtor filed his Statement of Financial Affairs (the

"**SOFA**").[27]  Question 4 of the SOFA requires Debtor to list "any income from employment or

from operating a business during [the filing] year or the two previous calendar years. . . ."  Debtor

failed to disclose both his 2016 and 2015 income or distributions from Home Group on his SOFA.

This is despite Question 4 requiring Debtor to list income for either: (1) the filing year; or (2) the

previous two calendar years. Question 4 required disclosure of either 2016 income or 2014 and

2015 incomes to answer the question properly.  In this case, instead of complying with the

requirements in Question 4, Debtor listed income from 2013 and 2014.[28]

**The Bederson Report**

At some point, Home Group hired the accounting firm Bederson LLP ("**Bederson**") to conduct a review of Home Group's books, records, and financial files. A month after Debtor filed for bankruptcy, Bederson reported its "preliminary observations" to Home Group with a letter dated April 15, 2016 (the "**Bederson Report**").[29]  The Bederson Report highlighted a number of errors in Home Group's financial records.[30]

The Bederson Report revealed discrepancies between Home Group's Accounts Payable and Line of Credit account.  The Bederson Report stated:

> [t]he Line of Credit is recorded as negative cash in two separate accounts totaling ($705,000). Additionally, several payments totaling $427,485 were made to pay down the line and recorded as Accounts Payable payments, resulting in a Fulton Bank negative Accounts Payable balance. Therefore, as of October 21, 2015, the erroneously recorded transactions [regarding the Line of Credit] had a net effect of overstating equity by $334,001 ($705,000 - $427,485 - $611,516) [sic]."[31]

The Bederson Report also identified and cataloged possible preference payments made by Home Group in the amount of $1.5 million within the 90-day period between August 20, 2015 and November 13, 2015.[32]   The Bederson Report stated Debtor received a total of $188,645 in distributions from Home Group for the year ending 2015.[33]

The Bederson Report's analysis of Home Group's 2013 and 2014 financial statements exposed an inconsistency in profit calculation in that gross profits were calculated assuming 25% profits per project.  In reality, gross profits only averaged 2% in 2013 and 2014, and 13% in 2015.[34]  The Bederson Report indicated Home Group failed to record "adjustments for 'billings in excess of costs and estimated earnings on uncompleted contracts' of $3.0 million and $7.3 million respectively" in QuickBooks™.[35]  The Bederson Report stated that Home Group's 2014 financial records appeared to have been adjusted after Home Group's accountant prepared the financial

statements.  Specifically, the Accounts Receivable and Account Payable amounts were recorded differently in Home Group's financial records versus its financial statements.[36]

## State of New Jersey Initiates Adversary Proceeding

On June 20, 2016, the New Jersey Division of Consumer Affairs initiated an adversary proceeding against Debtor, alleging false pretenses, false representation, actual fraud, arising out of his activities with Home Group.[37]   On May 21, 2018, the Court entered a *Final Consent Judgment*, which approved and authorized the settlement agreement reached by the Division of Consumer Affairs and Debtor.  Under the terms of the settlement agreement—in addition to requiring Debtor to pay certain sums as restitution to Home Group's clients—Debtor is permanently enjoined from engaging in business related to home elevation or building in the State of New Jersey.[38]

## Debtor's Chapter 11 Case Converts to Chapter 7

On November 2, 2016, the Court entered *Order Converting Case to Chapter 7*.[39]   On November 3, 2016, a Chapter 7 trustee was appointed to the case.[40]  The UST, separate from the Chapter 7 Trustee, also became involved in Debtor's Chapter 7 case.  On February 23, 2017, counsel for the UST ("**Counsel for the UST**") conducted an examination of the Debtor pursuant to Federal Rule of Bankruptcy Procedure 2004 ("**First Rule 2004 Examination**").[41]  On March 8, 2017, the UST conducted a second part to the Rule 2004 Examination ("**Second Rule 2004 Examination**").[42]

## UST Conducts 2004 Examination of Debtor

Debtor answered questions at the First Rule 2004 Examination under oath.  In the First Rule 2004 Examination, Debtor testified that he initially relied on the QuickBooks™ data that Home Group's accountant, Joyce Burgess Bartlett, compiled to ascertain Home Group's financial

status.  Debtor testified he raised concerns to Ms. Bartlett about the accuracy of Home Group's financial records—specifically how the records stated profits earned in September 2015.  Debtor testified that he then learned that Ms. Bartlett was projecting Home Group's profits at 25% instead of a 15% margin, which he says is what he requested in November 2013.[43]  Debtor also testified that he was surprised when Ms. Bartlett reported a $1.1 million operating loss on Home Group's 2014 tax returns when she was preparing the return in September 2015.[44]  Debtor stated that at the time, he was under the impression Home Group was operating with a $800,000 profit margin.[45]

At the Second Rule 2004 Examination, Debtor again answered questions under oath.  In the Second Rule 2004 Examination, Debtor testified, among other things, that Ms. Bartlett was in the process of preparing Home Group's 2015 tax returns, but he did not have the estimated $6,000–8,000 to pay her to file the return.[46]

**UST Initiates Adversary Proceeding Objecting to Debtor's Discharge**

On April 5, 2017, the UST initiated this adversary proceeding and filed a *Complaint Objecting to Debtor's Discharge* (the "**Complaint**").[47]

The Complaint contains two counts:

- Count 1 (the "**First Count**"): Objection to Discharge Under 11 U.S.C § 727(a)(5) for Failure to Explain Satisfactorily Any Loss of Assets or Deficiency of Assets to Meet Defendant's Liabilities;[48] and

- Count 2 (the "**Second Count**"): Objection to Discharge Under 11 U.S.C. § 727(a)(3) for Concealing, Destroying, Mutilating, Falsifying, or Failing to Keep or Preserve Recorded Information, Including Books, Records, and Papers, from Which the Defendant's Financial Condition or Business Transactions Might be Ascertained.[49]

The UST withdrew the First Count. [50]  Therefore, the Court will only discuss and decide the Second Count, regarding § 727(a)(3).

On May 23, 2017, the Debtor filed his *Answer to Adversary Complaint*.[51]  On February 16, 2018, Counsel for the UST conducted a deposition of Debtor (the "**Cowan Deposition**").[52]  Importantly, Debtor again answered questions under oath.  Debtor testified that the negative $411,371 net operating loss found on Line 21 and identified as "Other Income" on his 2015 personal tax return reflected the distribution he received from Home Group.[53]

On August 8, 2018, Counsel for the UST conducted a deposition of Ms. Bartlett who is, as stated earlier, both Home Group's accountant and Debtor's personal accountant (the "**Bartlett Deposition**").[54]  Ms. Bartlett provided her answers under oath.  In the Bartlett Deposition, Ms. Bartlett testified her duties for Home Group did not include bookkeeping or accounting.[55]  Ms. Bartlett affirmatively stated: "I was the CPA that came in to look at the bank accounts, to make sure they were reconciled.  I reconciled most of it or my staff came in to reconcile the banking, but I never input anything."[56]

Meaningfully, Ms. Bartlett testified Home Group's 2014 net income amounts recorded in QuickBooks™ do not match the income reported on the 2014 tax return.[57]  When asked why Home Group's net income reported on Home Group's financial statements did not match what was reported on its 2014 tax returns,  Ms. Bartlett stated:

> [t]hese are the financial statements the way the insurance company wanted the financial statements and this was really just for the insurance company.  This is called a special use, special purpose financial statement.  Might even say that on here.  So the report says that, you know, this is a special purpose percentage of completion. I don't know.[58]

Ms. Bartlett also testified there are discrepancies between Home Group's QuickBooks™ balance sheets and its 2013 tax return.[59]  When asked why the members' equity numbers reflected in Home Group's records did not match the numbers reported on Home Group's 2013 tax return, Ms. Bartlett expressed confusion, as she asserted the numbers matched before.  "I have been—I really

have gone over these meticulously over and over and, like I said, I've been deposed on these before

and they matched exactly. So I honestly don't know."[60]

## Debtor and the UST File Cross-Motions for Summary Judgment

On October 31, 2018, Debtor filed the instant Motion.[61] Debtor's pleadings included:

- *Statement of Material Facts*;[62]

- *Certification of David L. Stevens,* in which Debtor's counsel certifies the attached exhibits to the motion are true copies;[63]

- A copy of the Bederson Report;[64]

- A partial copy of Debtor's bankruptcy petition;[65] and

- Partial copies of transcripts of Debtor's Rule 2004 Examination, Deposition, and the deposition of Joyce Burgess Bartlett.[66]

On December 3, 2018, the UST filed the Cross-Motion.[67] The UST's pleadings included:

- *Certification of Bankruptcy Auditor Francyne D. Arendas in Support of Plaintiff's Opposition to Defendant's Motion for an Order Granting Summary Judgment and Plaintiff's Cross-Motion Requesting Summary Judgment on Complaint to Deny Discharge Pursuant to 11 U.S.C. § 727*, which contains Ms. Arendas's review of Debtor's Chapter 11 bankruptcy petition;[68]

- A complete copy of the Debtor's bankruptcy petition and schedules;[69]

- A complete copy of the Debtor's Rule 2004 Examination;[70]

- A complete copy of the transcript from Debtor's Deposition;[71]

- A copy of the UST's *Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding)*, dated January 12, 2017, wherein the UST specifically requested "complete copies of the 2015 Federal and State Tax Returns filed by the Debtor, including all supporting documents, W-2(s), 1099(s), K-1(s) forms, and for any business in which Debtor had an ownership interest, including, but not limited to, Price Home Group, LLC";[72]

- A *Statement of Undisputed Facts Pursuant to Fed. R. Bankr. P. 7056*;[73] and

- A *Response to Defendant's Statement of Undisputed Facts.*[74]

On December 28, 2018, Debtor filed *Brief in Opposition to Plaintiff's Cross-Motion for Summary Judgment and Response to Plaintiff's Opposition to Defendant's Motion for Summary Judgment*.[75]  Debtor opposes the UST's Cross-Motion, arguing Home Group's tax returns are not necessary for Debtor's bankruptcy and that Debtor kept and provided sufficient records, which provided a complete and accurate look of his financial condition.[76]

Debtor filed:

- *Defendant's Addendum to Statement of Material Facts Not in Dispute*;[77]

- *Defendant's Response to Plaintiff's Statement of Material Facts*;[78]

- A partial copy of the transcript from Debtor's Rule 2004 Examination;[79]

- A copy of an excerpt from Home Group's financial records dated 4/17/2017 (the "**Account QuickReport**");[80] and

- A copy of the UST's *Initial Disclosures Pursuant to Rule 7026*.[81]

Debtor denies the UST's statement of fact (found at Docket No. 18-4, ¶ 35) that Debtor testified his personal 2015 tax return did not reflect distributions from Home Group.[82]  Debtor stated that he testified his 2015 personal tax returns were completed and included projections for Home Group.  Debtor also stated that although the 2015 personal tax return did not attach a K-1 from Home Group, his 2015 personal tax return reflected the Home Group K-1 income.[83]

On February 11, 2019, the Court entered a docket text requiring Debtor to file full copies of the transcripts of the First and Second Rule 2004 Examinations and depositions that the parties relied on in the Motion and Cross-Motion.[84]  On February 21, 2019, the UST filed *Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross-Motion Requesting Summary Judgment on Complaint to Deny Discharge Pursuant to 11 U.S.C. § 727*.[85]  The UST reaffirms its argument that Home Group's tax return is essential to ascertain Debtor's financial situation, and Debtor's failure

11

to provide the document bars discharge under § 727(a)(3).[86]  The UST relies on Debtor's 2015

personal tax return as evidence Debtor failed to disclose Home Group's distributions to Debtor.[87]

**Summary Judgment Oral Argument**

The Court held a hearing on both the Motion and Cross-Motion (the "**Summary Judgment**

**Hearing**").  At the start of the argument, Debtor's counsel stated the Debtor recently gathered

enough funds and was prepared to file Home Group's 2015 corporate tax return.[88]  The Court

asked Counsel for the UST if Debtor's filing of Home Group's 2015 tax return would change the

UST's position in the instant adversary proceeding.  Counsel for the UST responded that it would

not change anything because too much time passed.  Debtor did not request the Court delay the

hearing or decision to permit him to file the returns.

Debtor's counsel reiterated the argument that Home Group's 2015 tax returns were not

necessary, as the Debtor provided the UST with substantial records that accurately depict the

Debtor's financial situation.  Debtor's counsel indicated the records were prepared by Home

Group's accountant, Ms. Bartlett, using raw data.  Debtor's counsel expressed confidence in the

accuracy of Ms. Bartlett's records, even when questioned on and presented with the discrepancies

mentioned in the Bederson Report.

Debtor's counsel, when questioned about the confusion Ms. Bartlett expressed when

reviewing Home Group's financial records during her deposition, indicated the information was

unclear to Ms. Bartlett because the transactions were misclassified in QuickBooks™.  Counsel for

the UST argued the financial records Debtor provided were unclear and relied on excerpts from

the Bederson Report to support his argument.  Counsel for the UST also indicated that Debtor's

SOFA remains essentially unverified by any sources other than Debtor, especially with the

discrepancies demonstrated by other witnesses and documents.  Counsel for the UST argued that

any confusion stems from the fact that Debtor provided the UST with documents that were substantially raw data, with little explanation of how the information was recorded or organized. Debtor's counsel admitted the "boxes and boxes of information" Debtor provided the UST were substantially raw data. Counsel for the UST further argued that the 2015 tax return—just that one document—would have clarified all of the UST's questions about the Debtor's financial situation in 2015 and resolved the adversary proceeding.

Counsel for the UST also argued the Debtor failed to justify his failure to file Home Group's 2015 corporate tax returns. Counsel for the UST stated Home Group was a sophisticated business that Debtor operated for three years, handling millions of dollars' worth of funds from clients. Counsel for the UST asserted "this is not a mom-and-pop shop on the corner." Counsel for the UST contended Home Group's decision not to file its tax return fails to satisfy the reasonableness standard required to support Debtor's justification under § 727(a)(3). Counsel for the UST further supported his position by relying on the fact that Home Group hired Bederson to review its books and records. Counsel for the UST argued hiring Bederson undoubtedly cost Home Group considerable funds. Yet Home Group, under Debtor's control, chose not to file its 2015 tax return.

Debtor's counsel responded by stating Debtor's 2015 distributions were reflected on Debtor's 2015 personal tax return in the amount of $2,000. Debtor's counsel mistakenly denoted the line as passive income, whereas the line in question refers to non-passive income on Debtor's tax return. The Court asked Debtor's counsel how Debtor came to that amount as Debtor previously testified he received around $20,000 a month in 2015. Debtor's counsel stated the $2,000 income was the net amount after taking into account Home Group's net losses for the year.

The Court notes that Debtor's deposition regarding the same issue provided a slightly different response:

| MR. ARTIS (Counsel for the UST): | And there's nothing on this tax return that reflects a K-1? |
|---|---|
| THE WITNESS (Debtor): | It doesn't appear to be. |
| MR. ARTIS: | Okay. And just to be clear, there's no distributions reported on this tax return? |
| THE WITNESS: | Not separate from that line. |
| MR. ARTIS: | Okay well, that line doesn't say distribution at all. It says net operating loss. |
| THE WITNESS: | Correct. |
| MR. ARTIS: | So there's no line item that says that you received distributions? |
| THE WITNESS: | No.[89] |

Debtor affirmatively testified the negative $411,371 figure on Debtor's 2015 return is the *only* reflection of Home Group's distributions to Debtor that year.[90] Yet, Debtor's counsel directed the Court to another line item in Debtor's personal 2015 tax return, the $2,000 of non-passive income from Schedule E, listed in the "Schedule K-1" column.[91] Again, Debtor never received a 2015 K-1 from Home Group. The Bederson Report demonstrates Home Group made distributions to Debtor in the amount of $188,645 in 2015.[92] The Court asked Debtor's counsel how the line item on Debtor's tax return could be verified, and Debtor's counsel responded that Debtor would need to elicit testimony from Ms. Bartlett.

Debtor's counsel, when queried by the Court, stated that he could submit new or additional facts that demonstrate Debtor's justification in failing to provide Home Group's 2015 corporate tax return. The Court declines that offer because Debtor: (1) already filed numerous submissions;

(2) had more than sufficient time to make his point and does, in fact, present reasons to justify why Home Group failed to file its 2015 return; and (3) provided the Court with enough information to decide the matter. Debtor's position is he provided the UST with enough information to ascertain his financial situation and he is justified in not providing Home Group's 2015 tax return, despite it being prepared. Further, Debtor was the initial movant in prosecuting summary judgment in this adversary proceeding. Surely if Debtor had any more information to support his Motion, he would have pled it in one of the many filings in support of the Motion or in opposition to the Cross-Motion.

To date, the parties dispute whether the information on Debtor's personal 2015 tax return reflects distributions from Home Group for that year. However, that dispute is not fatal to the Court deciding the pending Motion and Cross-Motion.

## DISCUSSION

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides for entry of summary judgment where "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[93] "A fact is material when its resolution 'might affect the outcome of the suit under governing law . . . .'"[94] An issue of material fact is considered genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[95]

At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial."[96] The court must construe facts and inferences in a light most favorable to the non-moving party.[97] The court can only consider evidence that would be admissible at trial.[98] Thus, "evidence whose foundation is deficient must be excluded from consideration."[99]

Parties have different evidentiary burdens at the summary judgment stage.  When the movant is the defendant, the party without the burden to prove the underlying claim, the movant "has no obligation to produce evidence negating its opponent's case."[100]  The defendant must simply demonstrate there is insufficient evidence to support the plaintiff's claim.[101]  When the moving party is the plaintiff, the party who bears the burden of proof at trial, the court places a stricter standard of review.[102]  The Third Circuit stated that "where the movant bears the burden of proof at trial" and the motion still demonstrates an issue of material fact, "the district court should deny summary judgment even if no opposing evidentiary matter is presented."[103]

Therefore, Debtor and the UST have different burdens of proof in order to prevail on their respective motions for summary judgment.  Debtor must show UST failed to meet its burden and UST must show by a preponderance of the evidence that it did.[104]

### B.  <u>Standards Under § 727(a)(3)</u>

A discharge under § 727 of the Bankruptcy Code is the primary tool used to afford debtors a fresh start.[105]  "Congress has described the discharge as the 'heart' of bankruptcy law's fresh start provisions."[106]  Objections to discharge under § 727(a) are liberally construed in favor of the debtor and strictly construed against the objector.[107]  Accordingly, "[c]ourts will deny a discharge only in extreme circumstances."[108]  Furthermore, Federal Rule of Bankruptcy Procedure 4005 provides that "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."[109]  However, the U.S. Supreme Court has been clear that the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'"[110]  "Accordingly, to receive a discharge, debtors must provide an accurate picture of their pre-petition financial affairs."[111]

16

Section 727 sets forth certain circumstances under which a court will deny the debtor his discharge.  Section 727(a)(3) provides that the court shall grant a discharge unless:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[….][112]

Section 727(a)(3) requires debtors to maintain and preserve sufficient and accurate record-keeping so that creditors and the trustee may ascertain their financial history and business dealings.[113]  To prove a claim under § 727(a)(3), a plaintiff must show by a preponderance of the evidence that: (1) the debtor failed to preserve adequate financial records; and (2) such failure makes it impossible to ascertain the debtor's financial condition.[114]  Intent is irrelevant.[115]  The only showing required is that the debtor unjustifiably failed to keep records of his financial condition.[116]

Once the plaintiff demonstrates a failure to maintain records, the burden shifts to the debtor, who then must justify his failure to the court's satisfaction.[117]  "Justification is not articulated in the Bankruptcy Code; thus, the trier of fact must make a determination considering the case's circumstances."[118]  Justification depends largely on what a normal, reasonable person would do under similar circumstances.[119]  The inquiry includes: the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice.[120]  When a debtor is unsophisticated or lacks experience in financial recordkeeping, courts have set a lower threshold for justification.[121]

Debtors may not avoid producing information regarding their financial history "under cover of a chaotic or incomplete set of books or records."[122]  "Creditors have the right to receive

sufficient information so that they can trace a debtor's financial transactions and should not be forced to 'speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs.'"[123]    A person seeking protection under the Bankruptcy Code must have records to qualify for a discharge.[124]    Without records a discharge may not be granted.[125]

In the instant case, Debtor contends he provided the UST with sufficient records to properly ascertain his financial situation.    Debtor argues that he prevails because no substantial questions remain regarding the Debtor's financial condition in 2015.    In the UST's Cross-Motion, the UST argues (a) Debtor kept inadequate records; and (b) failed to justify the inadequacy.    For the UST to prevail on its Cross-Motion, there must be no question of material fact as to either prong of the inquiry.

### 1.  The UST Demonstrated Defendant Failed to Preserve Adequate Records

To prove a claim under § 727(a)(3), a plaintiff must first show the debtor failed to preserve adequate financial records.[126]    Undoubtedly, the UST met its initial burden.    The information regarding Home Group's books and records that Debtor provided in this case creates confusion and is wholly inconsistent in every aspect.    While business records may not always be necessary to provide third-parties with a complete picture of a debtor's financial situation, that premise simply does not apply here.    Debtor testified he received on average $20,000 a month in distributions and approximately $32,000 in annual salary from Home Group in 2015.    The Bederson Report concluded that Debtor received over $188,000 in distributions from Home Group in 2015.    The amount is significant enough to alter the Debtor's financial outlook and, consequently, is worthy of review.

It is unclear whether Home Group's distributions to Debtor are reflected on Debtor's personal 2015 tax returns. Debtor's counsel stated at the Summary Judgment Hearing that Home Group's 2015 distribution to Debtor was recorded in Schedule E of Debtor's individual return as $2,000 of non-passive income. Notably, Debtor listed the $2,000 amount to which Debtor's counsel refers in the "K-1 Schedule" column of the tax return, despite Home Group admittedly never issuing the Debtor a K-1. There is no dispute that Home Group failed to file its corporate tax returns for 2015. Further, Debtor's SOFA provides no information on income he received from Home Group for either 2015 or 2016, because Debtor failed to answer Question 4 of the SOFA properly. Instead, income is only reflected for 2013 and 2014.

Counsel's argument regarding Debtor's tax return does not correspond to Debtor's testimony that the only Home Group distribution found on his 2015 tax return is a net operating loss in the amount of $411,371. When asked if there were any other distributions recorded on Debtor's 2015 tax return, Debtor responded, "No."[127] With no K-1 issued by Home Group to the Debtor for 2015, any reflected distribution from Home Group on Debtor's 2015 personal tax return remains unverified and certainly cannot align with the Home Group's books and records because those also contain errors. As per the Bederson Report, Home Group's distribution to Debtor in 2015 was $188,645. Debtor gave differing numbers—$20,000 per month in distributions and $32,000 in annual salary. The numbers do not match. Nowhere is the information readily verifiable. The Bederson Report is the only place information could be verified and the scope of work and circumstances for hire are unknown to this Court.[128] These discrepancies make it impossible for the UST or anyone else to readily ascertain Debtor's correct financial situation.

The UST relies on *In re Adalian* to show a failure to timely file tax returns "is a blatant example of a failure to maintain adequate records. . .where a debtor has not filed pre-petition tax

returns, the trustee and every creditor is denied potential access to a considerable amount of relevant information and other information."[129]  Debtor argues *In re Adalian* does not apply here because the debtor in *Adalian* failed to file over 10 years of personal and corporate tax returns, whereas Home Group is only missing one year.  This Court disagrees with Debtor.  As the UST correctly points out, Home Group was in operation for only three years.  Even one year without tax returns reflects one-third of Home Group's financial history and is, therefore, a significant omission.

Debtor instead relies on *In re Juzwiak* to argue he provided the UST with adequate records.[130]  Interestingly, the *Juzwiak* court denied the debtor's Chapter 7 discharge because it determined the debtor failed to preserve records that adequately disclosed his business transactions.[131]  The court focused on the fact that the debtor's business records neither reflected the source of the funds deposited into its account, nor did the records identify the cost of the goods sold.[132]  Here, Debtor contrasts himself to the debtor in *Juzwiak* because, unlike the *Juzwiak* debtor, he supplied the UST with numerous financial documents regarding Home Group.  In fact, Debtor's counsel stressed at oral argument, and the UST agreed, that Debtor supplied the UST with boxes and boxes of information.  But Debtor's counsel also acknowledged that the information provided was simply raw data.  Nothing was organized.  It was simply boxes and boxes of documents.  No one could discern what the information meant without employing an expert to make sense of the information.  This Court agrees with the UST that review of such information would require a herculean effort to even begin to understand.  Further, as shown by the numerous conflicts in Home Group's books and records, the repository of information supplied by Debtor fails to fill in the gaps that the 2015 Home Group tax return would answer.  Instead, one is left to fill in the blanks with information that conflicts from one source to the next, thereby making it wholly unreliable.

Debtor attempts to mitigate the failure to file and produce Home Group's 2015 tax return by offering the UST the Bederson Report. The Bederson Report, however, falls far short in filling the void found in Debtor's financial records regarding 2015.  Notably, the Bederson Report's peek into Home Group's finances revealed several deficiencies with Home Group's books and records. The Bederson Report indicated Home Group's 2013 and 2014 records included erroneous transactions that resulted in an overstatement of equity by $334,001.[133]  Additionally, the Bederson Report's analysis of the 2013 and 2014 financial statements showed a discrepancy in profit calculation: gross profits were calculated assuming 25% profits per project whereas in reality, gross profits only averaged 2% in 2013 and 2014, and 13% in 2015.[134]  The Bederson Report also stated billings in excess of costs in the amount of $3 million and estimated earnings on uncompleted contracts in the amount of $7.3 million were *never recorded* in the company's financial records.[135]  Finally, the Bederson Report indicated Home Group's 2014 financial records were adjusted after Home Group's accountant prepared the financial statements, which seems to be supported by Ms. Bartlett.[136]  The Accounts Receivable and Account Payable amounts differ from source to source.  In short, the Bederson Report raises more questions regarding Home Group's finances than it answers.

Ms. Bartlett, Debtor's and Home Group's accountant, sometimes appears to understand Home Group's discrepancies—such as the overstatement of profits in 2013 and 2014.  But, other times, she does not appear to understand the errors.  For instance, when asked why Home Group's net income reported on Home Group's financial statements did not match what was reported on its 2014 tax returns, Ms. Bartlett explained she prepared "special purpose" financial statements for the insurance companies, using a formula that ultimately did not reflect reality.[137]  But when asked about the discrepancy between Home Group's 2013 financial statements and its 2013 tax return,

Ms. Bartlett expressed confusion, as she was confident the numbers matched at the time she was previously deposed in another matter.

This Court cannot fathom how Debtor could expect a report that details a number of inaccuracies in Home Group's books and records to satisfy Debtor's obligations to provide true and correct information regarding his finances.  This Court notes that the Bederson Report was simply that—a report.  The inaccuracy of the source documents raises the question as to what other discrepancies exist, since the Bederson Report is limited to the scope designated by the Debtor (and unknown to the Court).  The Court is well aware that Debtor also controlled Home Group and Home Group hired Bederson.  But, for purposes of summary judgment, it is enough that the financial information Debtor provided to the UST is replete with conflicting information.

While it is not germane to the decision, the Court also notes the Debtor and his counsel seem to disagree as to the reliability of Home Group's accountant.  In the Debtor's 2004 Examination, Debtor testified that he lost confidence in Ms. Bartlett's accounting around September 2015.[138]  It was then Debtor learned Ms. Bartlett was projecting profits at 25% instead of a 15% margin like he requested in November 2013.[139]  Debtor also testified that he was shocked when Ms. Bartlett reported a $1.1 million operating loss on Home Group's 2014 tax returns, as Debtor was under the impression the company was operating with a $800,000 profit margin.[140]  At the Summary Judgment Hearing, however, Debtor's counsel highlighted the work done by Ms. Bartlett to show Debtor provided sufficient ascertainable financial information to the UST.  Debtor's attorney expressed confidence in the accuracy of Ms. Bartlett's records, even when questioned about the inconsistencies the Bederson Report highlighted.  The Court finds this confidence perplexing—even more so when considering the Debtor blamed Ms. Bartlett for the discrepancies found in Home Group's financial books and records.  Although interestingly Ms.

Bartlett refutes Debtor's testimony by testifying that she never handled Home Group's bookkeeping or its accounting; rather, she was hired as a CPA to review Home Group's bank accounts and to confirm they were reconciled.[141]  The conflicting statements simply support that the information provided by Debtor is inconsistent, confusing, and unreliable as provided.

The Court is cognizant—and wary—of the fact that all of Debtor's available personal and business financial information was heavily filtered by Debtor himself.  Debtor testified extensively as to Home Group's finances, from accounting errors and discrepancies, to his personal cash distributions.  It is *only* through Debtor's testimony that one has some semblance of Home Group's and subsequently, Debtor's financial status.  Ms. Bartlett used information Debtor provided her about Home Group's financials to make her assessment, further demonstrating all of Home Group's information came from Debtor and remains unverified.  As the UST points out, neither the Chapter 7 Trustee nor the Court is required to "take a debtor's word for his financial dealings."[142]  However, since this is the summary judgment stage, the Court is not weighing the testimony, simply examining the testimony, along with the information provided to find that Debtor failed to provide enough information to understand his financial condition.

To receive a discharge through bankruptcy, a debtor is obligated to disclose his financial situation to the appropriate authorities.[143]  This entails telling a story that already exists.  Instead, the Court finds Debtor is writing the story—crafting his financial outlook and offering uncorroborated supporting documents.  Debtor provides financial summaries generated from Home Group's books, but those summaries are from a compilation of unverified information.  Again, the information Debtor produced provides no answers but raises many questions.

The lack of reliable financial records leaves one needing to "speculate as to the financial history" of Debtor and requiring a "reconstruction" of his financial condition, which is the exact

situation § 727(a)(3) seeks to avoid.[144]   As a result, the Court concludes the UST successfully

established Debtor's financial records are inadequate under § 727(a)(3).

## 2. Debtor Failed to Demonstrate the Lack of Records was Justified

Now that the Court determined the UST met its initial burden to demonstrate Debtor failed

to provide adequate records to show Debtor's financial situation, the burden shifts to Debtor to

prove the lack of records was justified.[145]   As stated previously, the Court is bound to an objective

standard—what a reasonable person might do under similar circumstances.[146]   The Court's review

of reasonableness includes: the debtor's education, experience, and sophistication; the volume of

the debtor's business; the complexity of the debtor's business; the amount of credit extended to

debtor in his business; and any other circumstances that should be considered in the interest of

justice.[147]

Generally, justification is a factual issue warranting trial.   Here, however, a trial is

unnecessary.   The Debtor repeatedly provided his justification for failure to produce records.

Debtor states he provided enough information to the UST and there was no need to provide more.

Debtor also stated he could not afford to file Home Group's tax returns.   Debtor used his

justification to argue it was satisfactory for Debtor to fail to produce Home Group's 2015 tax

return.   Debtor's justification is woefully inadequate.

Here, Debtor is undoubtedly an experienced, sophisticated businessman.   Even though

Debtor knew little about construction when he started Home Group with his co-members, Debtor

made numerous forays into business.[148]   As stated earlier, Debtor either owned or operated a

number of businesses since 2007.

As the project manager of Home Group, Debtor took on the sales and marketing responsibilities of the company.[149]  Debtor testified that his role became more prominent after taking over his co-member's responsibilities.[150]  Debtor became proficient in the State Rehabilitation Program in order to receive projects and state funding.  This included reporting to three state program managers and to the Department of Consumer Affairs.  It also involved becoming proficient in Housing and Urban Development Section 3 regulations, as well as Environmental Protection Agency lead, asbestos, and remediation certification.  Debtor also attended meetings and seminars to learn about building requirements.[151]

 Debtor also testified Home Group was entrusted with millions of dollars from its customers over the course of three years.[152]  This business was not a "mom-and-pop shop on the corner," as Counsel for the UST argued at the Summary Judgment Hearing.  Clearly Debtor is a sophisticated businessman with complex business interests despite being unsuccessful with Home Group.  He has vast experience in overseeing many employees and handling millions of dollars.  Therefore, Debtor must be held to a higher standard to demonstrate a valid justification supporting the decision not to file the 2015 Home Group tax return.

The Court finds Debtor's explanations unsatisfactory.  Debtor justifies Home Group's failure to file 2015 tax returns because of the lack of sufficient funds to pay the accountant.  Under many scenarios, that justification could prevail.  In this case, it simply is not enough.  Debtor testified that Home Group's accountant asked for $6,000 to $8,000 to file the 2015 tax return but the money was not available.[153]  Supposedly, the returns were complete or nearly complete.  Interestingly, Home Group had enough money to hire Bederson to review Home Group's books and records and prepare the Bederson Report, which Debtor relied on in this case.  One must wonder how much that cost.  Surely the money would have been better spent in preparing and

filing Home Group's 2015 tax returns, which may have saved Debtor's discharge.  One can only speculate as to why Debtor employed this strategy, which was not a very good one.  Further, Debtor could have even attempted to subpoena a copy of the unfiled return to demonstrate he at least made an effort to obtain the documentation the UST repeatedly requested.  Here, the Court sees no effort.  Instead it appears Debtor made every effort to obfuscate his records by providing a lot of meaningless, unreliable, and conflicting information.  All Debtor had to do was supply one simple document, and as per the UST, this case would not have proceeded.  Debtor chose to roll the dice and lost.  This Court cannot reward this Debtor with a discharge when he purposefully chose to play fast and loose with the requirements of the Bankruptcy Code.

The UST met its burden demonstrating Debtor did not provide adequate records and that the Debtor failed to justify the lack of records.  Therefore, denial of Debtor's discharge under § 727(a)(3) is appropriate.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is DENIED.  Plaintiff's Cross-Motion for Summary Judgment is GRANTED.  An appropriate Order will be entered by the Court.

DATED: October 23, 2019

Honorable Stacey L. Meisel
United States Bankruptcy Judge

---

[1] *See* 11 U.S.C. § 727(a)(3).
[2] Docket. No. 15 (All Docket citations refer to Adversary Proceeding, Case No. 17-01247, unless indicated otherwise).
[3] Docket No. 15-2.

26

[4] Docket No. 18.

[5] Docket No. 18-3.

[6] *Id.* The UST formally withdrew its claim regarding § 727(a)(5), leaving the Court solely to analyze the UST's allegations under § 727(a)(3).

[7] Docket No. 15-1.

[8] *Id.*

[9] *Id.*

[10] Docket No. 25-1, First Rule 2004 Examination 39–40:1–25.

[11] Docket No. 25-8, Cowan Deposition 35–37:1–25.

[12] *Id.*

[13] *Id.* at 66:1–22.

[14] Docket No. 15-6 at 3.

[15] *Id.*

[16] Docket No. 15-11.

[17] *Id.*

[18] Docket No. 25-4, Second Rule 2004 Examination.

[19] Docket No. 26-1.

[20] Docket No. 25-8, Cowan Deposition 125:15–20.

[21] Main Case Docket No. 10.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Docket No. 25-6, Second Rule 2004 Examination 84:15–20.

[26] Main Case Docket No. 1.

[27] Main Case Docket No. 10.

[28] *Id.*

[29] Docket No. 15-6.

[30] *Id.*

[31] *Id.* at 2–3, ¶ 2. Apparently Bederson mistakenly labeled the $705,000 figure as a positive number and the other figures as negative numbers in its calculation of equity. Based on the preceding sentences discussing the equity calculation, the Court determines Bederson's conclusion that Home Group's financial records overstated equity by $334,001 is correct and the copy of the calculation was simple error.

[32] *Id.* at 3, ¶ 5.

[33] *Id.* at 3, ¶ 6.

[34] *Id.* at 4 ¶ 1.

[35] Docket No. 15-6 at 4, ¶ 2.

[36] *Id.* at 4, ¶ 3.

[37] Case No. 16-01527, Docket No. 1.

[38] Case No. 16-01527, Docket No. 19.

[39] Main Case Docket No. 68.

[40] Main Case Docket No. 71.

[41] Docket Nos. 25, 25-1, 25-2, 25-3, First Rule 2004 Examination.

[42] Docket Nos. 25-4, 25-5, 25-6, 25-7, Second Rule 2004 Examination.

[43] Docket No. 25-2, First Rule 2004 Examination 67:3–22.

[44] *Id.* at 66:10–24.

[45] *Id.*

[46] Docket No. 25-5, Second Rule 2004 Examination 41:15–19.

[47] Docket No. 1.

[48] *Id.*

[49] *Id.*

[50] Docket No. 18.

[51] Docket No. 5.

[52] Docket No. 25-8, Cowan Deposition.

[53] *Id.* at 125:15–20.

[54] Docket No. 25-9, 25-10, Bartlett Deposition.

[55] Docket No. 25-9, Bartlett Deposition 10:9–18.

[56] *Id.*

[57] *Id.* at 13–16:1–25.

[58] *Id.* at 14:14–23.

[59] *Id.* at 25–27:1–25.

[60] *Id.* at 26:9–12.

[61] Docket No. 15.

[62] Docket No. 15-2.

[63] Docket No. 15-3.

[64] Docket No. 15-6.

[65] Docket No. 15-9.

[66] Docket Nos. 15-5, 15-14, 15-15, 15-16, 15-17.

[67] Docket No. 18.

[68] Docket No. 18-1.

[69] Docket No. 18-2.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] Docket No. 18-4.

[74] Docket No. 18-5.

[75] Docket No. 20.

[76] *Id.*

[77] Docket No. 20-1.

[78] Docket No. 20-2.

[79] Docket No. 20-4.

[80] Docket No. 20-5.

[81] Docket No. 20-6.

[82] Docket No. 20-2, ¶ 35.

[83] *Id.*

[84] Docket No. 23.

[85] Docket No. 26.

[86] *Id.*

[87] Docket No. 26-1.

[88] To date, Debtor never advised the Court that he filed the Home Group 2015 tax return.

[89] Docket No. 25-5, Second Rule 2004 Examination 52:4–15.

[90] *Id.*

[91] Docket No. 26-1.

[92] Docket No. 15-6 at 3, ¶ 6.

[93] Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[94] *Justofin v. Metro. Life Ins.*, 372 F.3d 517, 521 (3d Cir. 2004).

[95] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[96] *Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003) (citing *Anderson*, 477 U.S. at 248).

[97] *Sauers v. Sauers*, 2014 WL 4771857, at *3 (Bankr. D.N.J. Sept. 23, 2014) (Steckroth, J.).

[98] *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989).

[99] *Williams*, 891 F.2d at 471.

[100] *Nat'l State Bank v. Bank of N.Y.*, 979 F.2d 1579, 1581–82 (3d Cir. 1992).

[101] *Id.* at 1582 (citing *Celotex Corp.*, 477 U.S. at 323–25).

[102] *Id.*

[103] *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992).

[104] *In re DiLoreto*, 266 Fed.Appx. 140, 145 (3d Cir. 2013) ("In order to state a claim under § 727(a)(3), the [movant] must demonstrate by a preponderance of the evidence that: (1) [debtor] concealed or failed to maintain and preserve adequate records, and (2) this failure made it impossible to ascertain his financial condition and material business transactions.").

[105] *In re Grammenos*, 469 B.R. 535, 546 (Bankr. D.N.J. 2012) (Gambardella, J.).

[106] *Grammenos*, 469 B.R. at 546 (quoting *BMMD v. Vasquez (In re Vasquez)*, 2010 WL 1644175, at *2 (Bankr. D.N.J. Apr. 21, 2010) (Steckroth, J.) (further citations omitted).

---

[107] *In re Drossel*, No. 06-21154 (DHS), 2009 WL 3230794, at *4 (Bankr. D.N.J. Oct. 1, 2009) (Steckroth, J.) (citing *Rosen v. Bezner*, 996 F.2d 1527, 1533 (3d Cir.1993); *Stapleton v. Yanni (In re Yanni)*, 354 B.R. 708, 712 (Bankr. E.D. Pa. 2006)).

[108] *Grammenos*, 469 B.R. at 546 (quoting *Vasquez*, 2010 WL 1644175 at *2 (further citations omitted).

[109] *Grammenos*, 469 B.R. at 546 (quoting Fed. R. Bankr. P. 4005).

[110] *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (further quotations omitted).

[111] *Grammenos*, 469 B.R. at 546 (quoting *Vasquez*, 2010 WL 1644175 at *2) (further citations omitted).

[112] 11 U.S.C. § 727(a)(3).

[113] *In re Kennedy*, No. 10-24535 (VFP), 2017 WL 573471, at *18 (Bankr. D.N.J. Feb. 8, 2017) (Papalia, J.) (citing *Meridian Bank v. Allen*, 958 F.2d 1226, 1230 (3d Cir. 1992)).

[114] *Kennedy*, 2017 WL 573471 at *18 (citing *In re French*, 499 F.3d 345, 354 (4th Cir. 2007)).

[115] *In re Carlbon*, No. 10-14413 (RTL), 2011 WL 6739507, at *5 (Bankr. D.N.J. Dec. 20, 2011) (Lyons, J.) (citing *Panda Herbal Int'l, Inc. v. Luby (In re Luby)*, 438 B.R. 817, 830–33 (Bankr. E.D. Pa. 2010)).

[116] *Grammenos*, 469 B.R. at 548–49 (citing *Meridian Bank*, 958 F.2d at 1234).

[117] *Id.,* at 549 (citing *Meridian Bank*, 958 F.2d at 1233).

[118] *In re Drossel*, No. 06-21154 (DHS), 2009 WL 3230794, at *5 (Bankr. D.N.J. Oct. 1, 2009) (Steckroth, J.) (citing *Meridian Bank*, 958. F.2d at 1231; *Yanni*, 354 B.R. at 715).

[119] *Grammenos*, 469 B.R. at 549.

[120] *Id.* (citing *Meridian Bank*, 958 F.2d at 1231).

[121] *Grammenos*, 469 B.R. at 549 (citing *Meridian Bank*, 958 F.2d at 1231) ("Obviously an unsophisticated wage earner dealing primarily in cash should not be denied a discharge because he failed to keep books of account. A higher standard of care is required, however, for a merchant actively engaged in credit transactions.") (internal citation omitted).

[122] *Kennedy*, 2017 WL 573471 at *19 (quoting *Meridian Bank*, 958 F.2d at 1230).

[123] *Id.* (quoting *Juzwiak*, 89 F.3d at 428).

[124] *Carlbon*, 2011 WL 6739507 at *7.

[125] *Id.* (citing *In re Prupis*, No. 04-48414 (RTL), 2007 WL 295351, at *1 (Bankr. D.N.J. Jan. 24, 2007) (Lyons, J.)).

[126] *Kennedy*, 2017 WL 573471 at *18.

[127] Docket No. 25-5, Second Rule 2004 Examination 52:15.

[128] The Bederson Report shows numerous inaccuracies in Debtor's books and records. However, the Court has many questions regarding the circumstances and scope surrounding its preparation. Regardless of the outstanding questions, the Court is able to utilize the report for purposes of summary judgment as both parties permitted it as an undisputed fact.

[129] 500 B.R. 402, 407–408 (Bankr. M.D. Pa. 2013).

[130] 89 F.3d 424 (7th Cir. 1996).

[131] *Juzwiak*, 89 F.3d at 425.

[132] *Id.* at 426.

[133] Docket No. 15-6 at 2–3.

[134] *Id.* at 4.

[135] *Id.*

[136] *Id.*; Docket No. 25-9, Bartlett Deposition 42–44:1–25.

[137] The Court notes that insurance companies assuredly do not desire faulty information, regardless of formula calculations.

[138] Docket No. 25-2, First Rule 2004 Examination 67:3–22.

[139] *Id.*

[140] *Id*. at 66:10–24.

[141] Docket No. 25-9, Bartlett Deposition 10:12–18.

[142] *In re Tanglis*, 344 B.R. 563, 569 (Bankr. N.D. Ill. 2006).

[143] *Broad Nat'l Bank v. Kadison*, 26 B.R. 1015, 1018 (D.N.J. 1983).

[144] *Juzwiak*, 89 F.3d at 428.

[145] *Kennedy*, 2017 WL 573471 at *18; *Meridian Bank*, 958 F.2d at 1233.

[146] *Meridian Bank*, 958. F.2d at 1231.

[147] *Grammenos*, 469 B.R. at 549 (citing *Meridian Bank*, 958 F.2d at 1231).

[148] Docket Nos. 25, 25-1, 25-2, 25-3, First Rule 2004 Examination.

[149] Docket No. 25-1, First Rule 2004 Examination 31:2–11.

[150] *Id.* at 31:1–25, 43–44:1–25.

---

[151] *Id.* at 39–40:1–25.
[152] Docket Nos. 25, 25-1, 25-2, 25-3, First Rule 2004 Examination.
[153] Docket No. 25-5, Second Rule 2004 Examination 41:15–19.